FILED

2015 Mar-23  AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| KRYSTAL WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )      CASE NO.  2:12-CV-2878-SLB |
| | ) |
| CORIZON, INC., doing business as | ) |
| Correctional Medical Services; ALVIN | ) |
| YATES, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment.  (Doc. 22.)[1]  Plaintiff Krystal Wilson has sued her former employer, defendant Corizon, Inc., and her former supervisor, defendant Alvin Yates, alleging that defendants discriminated against her on the basis of her race and gender and that they retaliated against her for complaining about discrimination.[2]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 22), is due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  Reference to a page number in such document refers to the page numbers assigned to the document by the court's CM/ECF electronic filing system, except a page number in a deposition refers to the page number of the original deposition transcript.

[2]The claims against Yates are limited to race discrimination and retaliation brought pursuant to 42 U.S.C. § 1981.

# I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  <u>STATEMENT OF FACTS</u>[3]

Defendant Corizon provides health care services to incarcerated persons. (Doc. 22-3 ¶ 3.) On November 1, 2007, Corizon contracted with the Alabama Department of Corrections to provide health care services in Alabama prisons, including the Donaldson Correctional Facility, a maximum-security prison with approximately 1,500 inmates. (*Id*.) It has three status classifications for its employees:

- Full-Time employees whom Corizon hires for and regularly schedules to work 40 hours per week;

---

[3]As required when evaluating a Motion for Summary Judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to Wilson, the non-moving party. *See E.G., Alan v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th Cir. 1997)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

- Part-Time employees whom Corizon hires for and regularly schedules to work less than 40 hours per week; and

- PRN[4] (Per Diem) employees whom Corizon hires to work "as needed" or to fill temporary vacancies.  PRNs advise Corizon of their shift availability at least monthly.  PRNs do not receive benefits and are not regularly scheduled each week.

(Doc. 22-3 ¶ 11 [footnote added]; *see* doc. 22-3, ex. E, at 31.)  During the relevant time, Corizon had approximately 31 Caucasian employees (63%) and approximately 18 African-American employees (37%) at Donaldson.  (Doc. 22-3 ¶ 3.)

Corizon's personnel policies and procedures are set out in a personnel manual entitled CMS Employee Success Guide [the Guide].  (Doc. 22-3 ¶ 4.)  The Guide includes an Equal Employment Opportunity policy, in which Corizon pledged to treat all its employees equally without regard to age, race, gender, sexual orientation, religion, national origin, and disability.  (Doc. 22-3 ¶ 5.)  The Guide explicitly states that all employees may complain of discrimination without fear of retaliation and it contains a grievance procedure.  (Doc. 22-3 ¶¶ 5-6.)  Corizon encourages its employees to discuss any problem, issue, or concern first with their immediate supervisor.  (Doc. 22-3 ¶ 6.)  If the employee's immediate supervisor fails to properly handle the issue or if the employee believes that he or she cannot discuss the issue with his or her supervisor, the employee should contact the Health Services Administrator [HSA], the Regional Manager, the Human Resources Department, or the Vice

---

[4]"PRN" is an abbreviation of the Latin phrase "pro re nata," which translates to "for the thing born" in English; the phrase's common medical meaning is "as needed."

President of Operations.  (*Id.*)  During all relevant time, Doug Green (white, male) was the

acting Director of Nursing [DON], defendant Alvin Yates (African-American, male) was the

HSA,[5] and Ken Dover (white, male) was the Regional Manager.  (Doc. 22-3 ¶ 14; doc. 27-1

¶¶ 4-5.)[6]

> Corizon also has an anti-harassment policy, which states:
>
> Harassment of any sort, whether verbal, physical, or visual, that is directed toward a person's gender, race, religion, sexual orientation, national origin, physical or mental disability, or age will not be tolerated.
>
> Workplace harassment can take many forms; it can be found in statements, gestures, writings, signs, cartoons, pictures, e-mail, jokes and pranks, physical contact and assaults, and acts or threats of violence or retribution.  Harassment is not necessarily sexual in nature.  It may also take the form of other activity including derogatory statements or conduct not directed to the targeted or offended individual, but taking place in their presence.
>
> [Corizon] prohibits not only harassment but also any type of retaliation for making a harassment complaint . . . .  All [Corizon] employees, particularly Supervisors and Managers, have a responsibility for keeping the work environment free of harassment or retaliation of any type.  Any employee, who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it by others, must report the incident as soon as possible.

---

[5]Corizon hired Yates as HSA in August 2010.  (Doc. 22-8 at 46; doc. 27-1 ¶ 5; doc. 22-3 ¶ 14.)

[6]Defendants have filed a Motion to Strike Affidavit of Krystal Wilson [Doc. #27-1] Filed in Response to the Defendant[s'] Motion for Summary Judgment.  (Doc. 29.)  By separate order, this Motion to Strike will be termed as moot because the court finds defendants' Motion for Summary Judgment is due to granted even if the court considers the challenged portions of Wilson's Affidavit.  *See Alexander v. City of Muscle Shoals*, 766 F. Supp. 2d 1214, 1244 (N.D. Ala. 2011).

(Doc. 22-3, ex. C, at 22.)  The Harassment Policy sets forth the internal complaint procedure, including an "800" number for employees to report claims of harassment.  (*Id.*; doc. 22-3 ¶ 9.)  The Policy instructs employees to report harassment to "their Supervisor, the next level site or regional management, or the Human Resources Department in [St.] Louis."  (Doc. 22-3, ex. C. at 22.)  Corizon provides training and education on harassment to all employees during its new employee orientation program.  (Doc. 22-3 ¶¶ 7, 10.)

On May 1, 2007, Corizon hired plaintiff Krystal Wilson (white, female) as a Licensed Practical Nurse [LPN].  (Doc. 22-3, ex. F, at 33-34; doc. 22-8, ex. 17, at 96.)   At that time, Corizon gave Wilson a copy of the Guide.  (Doc. 22-3 ¶ 4.)  On June 15, 2009, Corizon trained and tested Wilson on its anti-harassment policy.  (*Id.* ¶ 11.)  Thereafter, it re-tested her in April 2010, June 2010, and April 2011.  (*Id.*)

Wilson's performance review on May 20, 2010, indicated she either exceeded standards or met standards in every category.  (Doc. 22-10 at 36-38 [Wilson exceeded standards in 7 categories and met standards in 26].)  Green testified Wilson was a "good employee" and a "hard worker" and that she "performed well" in her position.  (Doc. 22-9 at 14, 25; doc. 22-3 ¶ 14.)

The Charge Nurse was the direct supervisor of the nurses on the shift and could initiate discipline of the nurses if events warranted.  (Doc. 22-9 at 21-22; doc. 27-1 ¶ 3.)

Kimberly Hewitt (African-American, female), RN,  was the day-shift Charge Nurse.[7]  (Doc. 27-1 ¶ 3; doc. 22-9 at 22.)

Wilson testified that Hewitt told her several times "that white girls were weak and that black women were strong."  (Doc. 22-4 at 35-36, 39.)  She said Hewitt would not speak to her and that "it was just always real tense."  (*Id*. at 35.)  She testified that, as far as she knew, Hewitt acted "ugly" only toward her.  (Doc. 22-4 at 41.)  She said, "[Hewitt] would not speak to me. . . . [W]hen she would, it was very hateful.  You would see her laughing and joking and playing around and helping other African-American employees, but with me, she would not help.  She would not talk unless she absolutely had to."  (*Id*. at 148; *see also id*. at 178-79.)  She testified that Hewitt and Yates appeared to get along very well and they laughed and joked together.  (Doc. 27-1 ¶ 6.)  According to Wilson, Hewitt's behavior became more hateful and aggressive toward her after Yates was hired.  (*Id*.)

Hewitt testified that Wilson was difficult to work with because she always had problems that she brought to work.  (Doc. 22-12 at 30.)  She testified that Wilson had difficulty focusing on her work and that she would forget what she was doing and have to be reminded.  (*Id*. at 33.)

In July 2010, approximately 210 Donaldson inmates became infected with tuberculosis [TB].  (Doc. 22-3 ¶ 15; doc. 27-1 ¶ 9.)  In response, Corizon created a

---

[7]Hewitt denied that she was a charge nurse by position or salary and she denied she was a supervisor.  (Doc. 22-12 at 21-22, 24-26, 29.)

temporary, part-time LPN day-shift position, the INH nurse,[8] whose sole responsibility was to provide medical care and treatment to the TB patients.  (Doc. 22-3 ¶ 15; doc. 27-1 ¶ 8.) On or about July 19, 2010, Wilson voluntarily transferred from her full-time (40 hours per week) day-shift position to the part-time (32 hours per week) temporary INH nurse position. (Doc. 22-3 ¶ 15; doc. 27-1 ¶ 8.)  At the time she transferred to the INH nurse position, she knew the position was temporary "until the TB situation was cured."  (Doc. 22-4 at 195-96; doc. 27-1 ¶ 8; doc. 22-3 ¶ 15.)

As the TB outbreak became controlled, Wilson cared for fewer TB inmates and she began assisting the day shift nurses in the infirmary and the pill-call room during her shift in addition to seeing TB patients.  (Doc. 27-1 ¶ 10; doc. 22-3 ¶ 16.)  By April, only a few inmates were on the INH protocol.  (Doc. 22-4 at 29-30; doc. 22-8 at 125-26; doc. 22-8, ex. 9, at 75.)

On April 29, 2011, Wilson was assisting LPN Tiffany Nicholas[9] (white, female) with the diabetic pill call.  (Doc. 22-4 at 46; doc. 22-3 ¶ 16.)  Wilson drew up insulin using a "cheat sheet" the day shift nurses, Nicholas and Sandra Hackworth (African-American, female) had created.  (Doc. 27-1 ¶ 11.)  Green testified that this was the only time he was

---

[8]Isoniazid or "INH" is the drug used to treat a latent TB infection and TB disease. *See* Centers for Disease Control and Prevention, Tuberculosis Treatment at <<http://www.cdc.gov/tb/topic/treatment/default.htm>>.

[9]Nicholas is also referred to as Tiffany Rambo throughout the record. (*See* doc. 22-3 ¶ 16; doc. 27-1 ¶ 11.)  For purposes of this decision, the court will refer to her exclusively as Tiffany Nicholas.

8

aware a cheat sheet had been used to prepare inmates' medication.  (Doc. 22-9 at 29-30.)

Wilson prepared the inmates' insulin and gave the syringes to Nicholas to give to the

inmates.  (Doc. 22-4 at 50.)  Later, when Wilson went to sign off on the Medication

Administration Record [MAR] she noticed that the physician had changed one inmate's type

of insulin, but the "cheat sheet" had not be updated.  (Doc. 27-1 ¶ 12; doc. 22-4 at 50-52.)

Wilson told Nurse Practitioner Dennis Butler (white, male) that she had relied upon the

accuracy of information on a nurses' cheat sheet, rather than checking the MAR, and had

given the inmate the wrong insulin.  (Doc. 22-4 at 52; doc. 27-1 ¶ 13.)

Pursuant to Corizon policy, nurses must administer medications only from the MAR.

 (Doc. 22-8 at 71; doc. 22-3 ¶ 16.)  Corizon had trained and tested Wilson on proper

medication administration.  (Doc. 22-3 ¶ 16.)

Green and Butler told Wilson to take the inmate to the infirmary so his vital signs

could be monitored for any adverse reaction.  (Doc. 27-1 ¶ 13; doc. 22-4 at 52-53.)  As soon

as Hewitt learned about the incident, she went to the medication room and talked to Nicholas

and Hackworth.  (Doc. 27-1 ¶ 15; doc. 22-4 at 53-54.)  Wilson is not sure what Hewitt said

to Nicholas and Hackworth immediately after the medication error, but she testified that

Hewitt appeared to be attempting to inflame the situation because Nicholas and Hackworth

came out of the medication room and were upset with Wilson.  (Doc. 22-4 at 54-55; doc. 27-

1 ¶ 16.)  According to Nicholas's statement, dated April 29, 2011, "Hewitt came to the med

room and asked [Nicholas] to speak with Butler and see what was going on with [the

inmate's] blood sugar." (Doc. 22-8, ex. 1, at 50-51.)  This statement of what Hewitt said coincides with Hackworth's statement that Hewitt told Nicholas to go to the infirmary to "see what was going on with [the inmate's] insulin." (Doc. 22-8, ex. 5, at 64.)

According to Wilson, this medication error was not particularly serious and her employment was never in jeopardy. (Doc. 27-1 ¶ 14; *see also* 22-8 at 95 [Yates testified that "[d]iscipline was never even brought into the equation at all."].) Wilson testified that she had accepted responsibility for the medication error as soon as she discovered it. (Doc. 27-1 ¶ 14; doc. 22-4 at 54.) According to Wilson, Nicholas and Hackworth did not appear upset with her about the incident or about her reporting the incident. (Doc. 27-1 ¶ 15.)

When Yates was notified about the medication error, he convened a telephone conference call with Wilson and the other day-shift nurses at work that day. (Doc. 22-8 at 83-84.) The conference call included Wilson, Nicholas, Hewitt, and Hackworth, as well as Butler. (Doc. 22-8 at 84; doc. 27-1 ¶ 18.) Before the call, according to Wilson, Hackworth had stated that she did not know why she was being called into the office, to which Hewitt had responded "because you are black." (Doc. 27-1 ¶ 19; doc. 22-4 at 59.) After the conference call, Wilson complained to Green about Hewitt's "because you are black" comment. (Doc. 27-1 ¶ 21.) Green told her to talk to Yates. (*Id*.)

During the conference call, Wilson and Nicholas agreed that Nicholas had instructed Wilson to use the MAR, and not the cheat sheet, to prepare the insulin for the inmates. (Doc. 22-8 at 85-86, 106.) Yates considered the matter closed following the conference call. (*Id*.

10

at 94, 106.)  Yates never disciplined either Wilson or Nicholas over the medication error. (Doc. 22-8 at 95.)

At Yates's request, the nurses submitted written statements regarding the April 29, 2011, medication error.  (Doc. 22-8 at 75-76.)  Wilson's first statement did not mention Hewitt's comment to Hackworth.  (Doc. 22-8, ex. 4, at 62.)  Hackworth's statement does not mention Hewitt's "because you are black" comment; however, she did recount a discussion between Nicholas and Wilson regarding what Wilson had told Butler about the medication error, after which Wilson "stormed out of the room."  (Doc. 22-8, ex. 5, at 64.)  Thereafter, according to Hackworth's statement, Green asked Nicholas to apologize to Wilson  for hurting her feelings and Nicholas refused, stating that she had not done anything wrong.  (*Id*.)

On Saturday, April 30, 2011, Wilson prepared a second statement.  (Doc. 22-8, ex. 3, at 56-60; doc. 22-4, ex. 3, at 171.)  Yates testified that he received this statement on Monday, May 2, 2011.  (Doc. 22-8 at 80.)  That same day, Wilson verbally complained to Yates and he told her to put her complaint in writing.  (Doc. 27-1 ¶ 21; doc. 22-4 at 60.)  In the statement dated April 30, 2011, Wilson said that Nicholas had told her to use the cheat sheet and that the cheat sheet was up-to-date.  (*Id*. at 56-57.)  According to her statement, she told Green and Butler about the cheat sheet.  (*Id*. at 57.)  She stated that Nicholas had accused her of bringing her name up to Butler, which Wilson denied.  (Doc. 22-4, ex. 3, 171.)  Also, Wilson stated, "Mrs. Nicholas did not tell Mr. Yates the truth.  She stated she told me to not use the sheet for insulin.  That is not true.  That statement was never made." (Doc. 22-

11

8, ex. 3, at 58.)  She recounted Hewitt's "because you are black" statement, which she claimed was"very disrespectful" and "a racist remark."  (Doc. 22-8, ex. 3 at 58-59; *see also* doc. 22-4 at 59-60.)  Wilson complained that Hewitt was harassing her by going to Nicholas and Hackworth and "trying to stir something up". (Doc. 22-4, ex. 3,  at 171-72.)

Yates testified that Wilson was upset on Monday, so he told her to go home.  (Doc. 22-8 at 94, 107.)  After Wilson left, Yates talked to the staff about harassment.  (*Id*. at 109-10, 120.)  Wilson was not informed about this meeting.  (Doc. 27-1 ¶ 26.)

After leaving work on Monday, Wilson went home and typed a third statement, which she gave to Yates on Wednesday, May 4, 2011, in which she "request[ed] to either work on the other side of medical and not in the infirmary, or [to] change to a different shift due to the situation that occurred on 4/29/2011."  (Doc. 22-8, ex. 7, at 68; doc. 22-4 at 84-85; doc. 27-1 ¶ 25.)  She wrote:

> I feel as though it would be a hostile environment to work with certain coworkers.  As a nurse at Donaldson you have to work as a team and I feel as though certain nurses would not be willing to work as a team with me.  I feel that this situation has the potential to negatively affect the Inmates we provide care to.  I greatly appreciate your attention in this matter.

(Doc. 22-8, ex. 7, at 68.)  She did not identify the "certain coworkers" or "certain nurses" referred to in this statement.  (*See id*.)  Also, she did not allege that her work environment is hostile because of her gender or her race; rather, she said the hostility was based on the "situation that occurred on 4/29/2011," the date of her medication error.  (*See id*.)

12

Following his receipt of Wilson's complaint about a "hostile environment," Yates asked her to give him more information and "to be specific about a hostile work environment," including the names of the "certain coworkers" referred to in her statement. (Doc. 22-8 at 107; doc. 22-4 at 79.)  Yates called Wilson into his office and, according to Wilson, Yates yelled at her and forced her to write and rewrite statements regarding her complaint about a hostile environment.  (Doc. 27-1 ¶ 27; doc. 22-4 at 87, doc. 22-8, ex. 8, at 70-73.)  Her first statement, dated May 4, 2011, identified Hewitt as the coworker who had created the hostile environment; Wilson asked to be assigned to an area other than the infirmary.  (Doc. 22-8, ex. 8, at 70.) ["I feel as though it would be a hostile situation to work with Mrs. Hewitt in the infirmary.  I would like to avoid this situation if at all possible."].)  She stated:

> . . . I feel like when I have worked with [Hewitt] in the past there was a lack of communication.  She will not speak to me at all.  If I ask her a question, she will answer.  The answer is short and hateful sounding.  If there is a bodychart or I am doing something with a patient she will not help me in any way.  If she is doing a bodychart or anything I will try to help her by doing VS or anything I think of to do to help.  For example, on Friday we had two admissions in the infirmary.  One I did the infirmary assessment and sheet by myself.  She did start his IV.  The second admission was due to a med error by me and she would not start it for me.  I feel our communication would get worse.

(Doc. 22-8, ex. 8, at 71.)

Because this letter mentions only named Hewitt, Yates asked Wilson to write another statement.  (Doc. 22-8 at 112.)  In this second statement, dated May 4, 2011, Wilson wrote:

> If Mrs. Nicholas and Mrs. Hewitt would be O.K. working with me, without having a bad attitude or actions towards me, and put all differences aside I

> would feel comfortable working with them.  Due to the fact this is the first
> time me and Mrs. Nicholas have had differences this may could happen.  But
> I'm not sure Mrs. Hewitt would be willing to put all differences aside and
> work as a team.

(Doc. 22-8, ex. 8, at 72.)  This statement did not allege that the "bad attitude or action" were

because of her race and/or her gender.

Yates again asked Wilson to provide more details of her claim of a hostile

environment.  (Doc. 22-8 at 112.)  In the third statement, dated May 4, 2011, Wilson stated:

> The reason I feel as though there would be a problem working with
> Mrs. Nicholas is she may not be willing to put the difference we had regarding
> what was said to each other during the med error incident.  For example, that
> she stated she did tell me not to use the sheet and to use the MAR.  And I deny
> that.  Also that she feels I was trying to blame her for the med error, and I take
> full responsibility for the med error.  Also that I think she thinks that I was
> trying to "tattle" on her because I was sitting in the office trying to fill out med
> error paperwork.  I was not trying to tattle on anyone, in my opinion.  There
> was no one who did anything wrong besides me and no one else to blame.  I
> am also not trying to blame Mrs. Hewitt or Mrs. Hackworth for the med error,
> neither one of them were anywhere around when I did it.

(Doc. 22-8, ex. 8, at 73.)  She did not mention race or gender as the reason for any hostility

from her coworkers; instead, she relates the animosity to the medication error of April 29,

2011.  (*Id.*)

Wilson testified that Yates had her sit in a corner of the room at a desk while he stood

over her in front of the desk.  (Doc. 27-1 ¶ 27; doc. 22-4 at 87.)  She said Yates yelled at her.

(Doc. 27-1 ¶ 27.)  Also, after she would write a statement, Yates would read it and yell at her

that the statement was not right; he repeatedly told her to re-write the statement.  (*Id.*)  Yates

took some of the statements, wadded them up, and threw them in the trash can.  (*Id.*; doc. 22-

4 at 95.)  Wilson testified that she felt that she spent "an eternity" writing the statements.  (Doc. 27-1 ¶ 27; doc. 22-4 at 95.)  Yates denied he forced Wilson to write the statements, that he threw any of her statements in the trash, or that he yelled at her.  (Doc. 22-8 at 108-09, 113.)  However, for purposes of deciding defendants' Motion for Summary Judgment, the court will assume that Wilson's version of this incident is accurate.

Yates forwarded Wilson's statements to Dover for Dover to resolve.  (Doc. 22-8 at 118-19.)  Thereafter, he assumed the matter had been resolved because, as he testified, he did not "recall anything more ever happening."  (*Id*. at 119.)

On May 6, 2011, Yates informed Wilson that Corizon was eliminating the INH nurse position due to the substantial decrease in TB patients.  (Doc. 22-8 at 123-24; doc. 22-8, ex. 9, at 75; doc. 27-1 ¶ 28.)  According to a letter given to Wilson,[10] "At the start of [the INH nurse position], you were following the Tuberculin treatment of approximately 210 inmates.  As of May 6, 2011, the number reduced to 24, and in June 2011 the number will be 20 or 9.5% of the original workload."  (Doc. 22-8, ex. 9, at 75.)  Yates offered Wilson a temporary full-time position on the second shift, which Wilson accepted.  (*Id*.)  She told Yates that she wanted to be considered for the permanent position.  (Doc. 27-1 ¶ 29; doc. 22-4 at 102.)  Yates responded that when it came available she could put in an application.  (Doc. 27-1 ¶

_____

[10]Yates testified that he gave Wilson a copy of this letter on May 6, 2011.  (Doc. 22-8 at 124.)  However, Wilson testified that she did not receive a copy of the letter until several weeks later.  (Doc. 27-1 ¶ 28.)  Nevertheless, the fact that Wilson was moved to the interim second-shift position in early May 2011 does not appear to be disputed.

29; doc. 22-4 at 102-03; doc. 22-8 at 123.)  Wilson testified Yates also told her that she could

no longer work in the infirmary.  (Doc. 27-1 ¶ 28.)  The record is unclear whether Wilson's

duties on the second shift required her to work in the infirmary.  However, on the second

shift, Wilson was not required to work with Hewitt or Nicholas who worked the day shift.

Melissa Curry (white, female) submitted two applications for an LPN position to

Corizon – one dated June 1, 2011, (doc. 27-6), and another dated June 4, 2011, (doc. 27-7).

During early June 2011, Wilson learned from Green that Yates had conducted

interviews for the second-shift position although the position had not been posted.  (Doc. 27-

1 ¶ 31; doc. 22-4 at 103.)  On June 7, 2011, Wilson called Peggy Miniard, an employee in

the Human Resources Department, and asked her when the second-shift position would be

posted.  (Doc. 27-1 ¶ 32.)  That day, Corizon posted an Internal Vacancy Announcement

seeking applicants for the full-time second shift LPN position.  (Doc. 22-8 at 129-30; doc.

22-8, ex. 10, at 77.)  The Position Description stated:

> In a team relationship with the [RN] and co-workers, the [LPN] works with a
> variety of healthcare professionals and correctional officers in a correctional
> and at times, stressful environment.  Nurse contributes to the nursing process
> through team work and assignment flexibility including but not limited to
> shifts and job assignments.  Nurse assists in ensuring continuity of care is
> provided with adherence to federal, state and local regulations and guidelines,
> in addition to Corizon and facility policies and accepted nursing protocols and
> procedures.

16

(Doc. 22-8, ex. 10, at 77.)  Also, one of the minimum qualifications for the position was an ability "to function in a stressful environment and [to] relate well to the patients, security staff and healthcare team members."  (Doc. 22-8, ex. 10, at 77.)

At this time, according to Yates, he was in the process of cross-training the nurses to enable them to work any shift in any area.  (Doc. 22-8 at 122.)  However, Wilson testified, "Yates had not announced or implemented any specific program of cross-training [and such a program] did not exist at [any] time[ ] throughout my employment."  (Doc. 27-1 ¶ 47.)

Prior to her interview, Green had told Wilson that she was the most qualified applicant and he could not see any reason she would not get the second-shift position.[11]  (Doc. 27-1 ¶ 33; doc. 22-4 at 112-13.)

Yates interviewed Wilson on June 10, 2011.  (Doc. 27-1 ¶ 34.)  He interviewed her alone, even though, according to Wilson, the normal procedure was for the DON or some other person to sit in on interviews.  (*Id.*; doc. 22-4 at 111, 120.)  Before the interview began, Green started to enter the room for the interview, but Yates told him, "I got this."  (Doc. 27-1 ¶ 35; doc. 22-4 at 120.)  During the interview, Yates questioned Wilson about conflicts with co-workers.  (Doc. 27-1 ¶ 36; doc. 22-4 at 122.)  Wilson testified that she believed Yates wanted her to talk about Hewitt, Nicholas, and Hackworth, and to say she could not work with them.  (Doc. 27-1 ¶ 36.)  According to Wilson, Yates raised his voice[12] and seemed

---

[11]Green testified that he did not remember telling this to Wilson.  (Doc. 22-9 at 42.) Wilson did not testify whether Green knew about her request not to work with Hewitt.

[12]Yates denies raising his voice during the interview.  (Doc. 22-8 at 135-36.)

angry when she told him that she could work well with everyone.  (Doc. 27-1 ¶ 36.)  Wilson

considered the entire interview "hostile."  (Doc. 22-4 at 163.)

At the end of the interview, Yates told Wilson that he interviewed her, but he would

not consider her for the second-shift position.  (Doc. 27-1 ¶ 37; doc. 22-4 at 122.)  According

to Wilson, Yates told her that he wanted more diversity.  (Doc. 27-1 ¶ 37.)  Also, she said

Yates told her that she could call whomever she wanted but his decision was final.[13]  (*Id*.)

Yates identified as problematic the fact that Wilson had requested not to work with

Hewitt and Nicholas, yet the second-shift position required the successful applicant to work

all shifts and in all areas of the facility, including the first shift and in the infirmary where

Hewitt and Nicholas worked.  (Doc. 22-8 at 154-55.)  According to Yates, he told Wilson

that she was not selected for the open position because that position required flexibility in

assignments and she had expressed an unwillingness to work all assignments.  (*Id*.; doc. 22-8,

ex. 18, at 104-05; *see also* doc. 27-1 ¶ 47.)  During the interview, Yates told Wilson that she

would continue in the PRN position.  (Doc. 22-8 at 136-37.)

On or about June 17, 2011, Yates hired Curry to fill the second-shift position.  (Doc.

22-8 at 138; doc. 27-8.)  After her interview, Green told Wilson that she needed to find other

employment because Yates was going to keep her on the work schedule but that he would

not give her any hours. (Doc. 27-1 ¶ 39.)  Wilson submitted an employment application to

---

[13]Yates did not remember making such a statement and he testified that he would not
have said that.  (Doc. 22-8 at 137.)

Mental Health Management [MHM] on June 17, 2011.  (Doc. 22-4 at 125-56, 128; doc. 27-1 ¶ 40.)

Three days later, on June 20, 2011, Yates gave Wilson a letter regarding the impending change in her work assignment; this letter stated:

> As you have already been made aware the temporary [p]art-time position you previously filled was phased out.  Effective July 3, 2011 your status will be changed from [p]art-time (32 hours per week) to PRN (as needed) as discussed on May 6, 2011.  Please provide your availability to RN Doug Green at your earliest opportunity so you can be considered for the July 2011 and future schedules.
>
> It is good to know I can count on you to continue to deliver the same high quality care to our patients.  Your efforts are appreciated.

(Doc. 22-8, ex. 12, at 82.)  Wilson signed the PRN Working Agreement on June 21, 2011. (Doc. 22-8, ex. 11, at 79-80.)

The PRN nurses would provide their availability to Green and/or Yates; and Yates would finalize the schedule.  (Doc. 22-8 at 143-44; doc. 22-9 at 47-48; *see also* doc. 27-1 ¶ 42.)  Wilson testified that her schedule was reduced from five days a week to three or four days a week as a PRN employee.  (Doc. 27-1 ¶ 41.)  After the second shift position was filled, Wilson was scheduled to work 32 hours per week, the same number of hours she was working as the INH nurse.  (Doc. 22-4 at 162, 166-67; doc. 22-3 ¶ 22.)

However, after Curry started work, an inmate began requiring one-on-one care in the infirmary during a modified day shift, so Corizon assigned Curry to that inmate and Wilson once again was scheduled to work the second shift LPN position on an interim basis.  (Doc.

19

22-3 ¶ 22.)  On July 1, 2011, two days before she was scheduled to begin working as a PRN employee, Wilson submitted a resignation letter to Green, stating that her last day with Corizon would be July 15, 2011.  (Doc. 22-8, ex. 14, at 86; doc. 27-1 ¶ 43.)  In this letter, she stated:

> Please accept this as my two week resignation letter.  My last day with Corizon will be 7-15-2011.  I feel as though I must resign due to the hostile environment by my supervisor.  I am giving a two week notice so that if I ever apply I will be considered for future employment.

(Doc. 22-8, ex. 14, at 86.)  According to Yates, Green was Wilson's supervisor at this time. (Doc. 22-8 at 146.)  Wilson did not complain that Green was harassing her.  However, in her EEOC Charge, signed on July 6, 2011, she alleges Yates had created a hostile work environment that forced her to resign.  (Doc. 22-8, ex. 17, at 97.)

The EEOC Charges states, *inter alia*, "On July 1, 2011, I was forced to resign my employment because Mr. Yates created a hostile work environment," based on the fact that he did not speak to her after June 10, 2011, he did not make eye contact, he asked her coworkers about her job performance, and he spoke to overweight white females in a harsh and demeaning manner.  (*Id.*)  Wilson testified that Yates was hateful to her and other white female employees, but he was friendly to male employees and African-American female employees.  (Doc. 27-1 ¶ 7; doc. 22-4 at 42, 148-50, 151-53, 156, 158, 179-80.)  Wilson testified that Yates's treatment of her worsened after she complained about Hewitt.  (Doc. 27-1 ¶ 7.)  In her deposition, she testified:

20

> [I] would see [Yates] laughing and joking and playing with the African-Americans there, and mainly men.  And he would be real short and yell, wouldn't make eye contact.  The main thing was . . . just the yelling.
>
> . . .
>
> . . . [And] he would meet my coworkers out front and question them about if there was anything that I did wrong or what exactly I did the day before.  They would tell me that they were tired of him . . . drilling them on what they seemed to think was trying to find something that I did wrong.  I felt like he was constantly, constantly throughout the day trying to intimidate.

(Doc. 22-4 at 148-49; *see also id.* at 179-80.)  She also testified that Yates would stand around in "an intimidating manner, like he was watching [her]."  (*Id*. at 149.)

Between July 1 and July 15, 2011, Wilson continued to work in her PRN capacity for Corizon.  (Doc. 22-3 ¶ 26; doc. 22-8 at 148.)  She never complained to Dover, Corizon's Human Resources Department, Corizon's Vice President of Operations, or the 800 number to complain about any discriminatory treatment.  (Doc. 22-3 ¶ 26.)  She did not mention a hostile environment to Yates between her statements in early May 2011 and the July 1, 2011, resignation letter.  (Doc. 22-8 at 146.)

On July 11, 2011, MHM offered Wilson an LPN position, which she accepted on July 13, 2011.  (Doc. 22-4, ex. 4, at 50-51.)  Her pay rate at MHM was lower than she would have received as a full-time LPN with Corizon.  (Doc. 27-1 ¶ 45; doc. 22-4 at 155-56.)  MHM provides mental health services to Donaldson inmates.  (Doc. 22-4 at 142.)  The mental health nurses frequently interact with the medical care nurses while treating inmates.  (*Id*. at 141-42.)  After Wilson was hired by MHM, the company gave her a letter to carry which

stated that she was authorized to be in areas shared by CMS and MHM in case she had to interact with Yates.  (Doc. 27-1 ¶ 46; doc. 22-4 at 141-42, 145.)  Wilson is currently working full-time at the Donaldson facility as an MHM employee.  (Doc. 22-4 at 205.)

Yates received a copy of Wilson's EEOC Charge on July 14, 2011.  (Doc. 22-8 at 149-50; doc. 22-8, ex. 17, at 93-97.)  He did not recall any action he took to investigate Wilson's charge other than speaking with Corizon's attorneys.  (Doc. 22-8 at 151-52.)

### III. <u>DISCUSSION</u>

## A.  RACE AND GENDER DISCRIMINATION

Wilson alleges that she was discriminated against on the basis of her race and gender as to four employment actions or decisions:  (1) removal as INH nurse and placement in a PRN position, (2) nonselection for the full-time second-shift LPN position, (3) creation of a hostile work environment, and (4) constructive discharge.  Because she relies upon circumstantial evidence to prove her race and gender discrimination claims, the court's analysis is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).[14]  The Supreme Court has explained this framework as follows:

---

[14]The analysis of § 1981 claims "mirrors that under Title VII."  *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010)(citing, *inter alia*, *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991)).

*McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the [defendant] produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the [defendant's] proffered explanation is unworthy of credence.

*Id.* at 142-43 (internal citations and quotations omitted).

Generally, "plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)(citations omitted).  A plaintiff alleging a hostile work environment based on race or gender harassment must show that the terms and conditions of her employment were adversely effected by severe or pervasive harassment – based on her race or gender.  Defendants contend that plaintiff cannot

establish a prima facie case of discrimination because she cannot establish that she was subjected to an adverse employment action and/or show that a similarly-situated African-American or male employee was treated more favorably.

### 1.  Adverse Employment Action

An adverse employment action is an essential element of a claim of discrimination. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001).  "[T]o prove [an] adverse employment action . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment."  *Id*. at 1239, *quoted in Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010).  "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis*, 245 F.3d at 1239, *quoted in Howard*, 605 F.3d at 1245.  Therefore, plaintiff must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)(citing, *inter alia*, *Davis*, 245 F.3d at 1239).

An "ultimate employment decision" is one "such as termination, failure to hire, or demotion."  *Id*.  For a decision "falling short of an ultimate employment decision" to rise to the level of an actionable adverse employment action, that decision "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her

24

status as an employee." *Id.* (internal quotations and citation)); *see* 42 U.S.C. § 2000e-2 (a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .")  Among the facts and circumstances affecting whether a decision is considered "adverse" are whether the decision results in "lesser pay, responsibilities or prestige," and whether the decision would "impede an employee's professional growth or advancement." *Doe v. DeKalb County School District*, 145 F.3d 1441, 1452 (11th Cir. 1998).  "Although proof of direct economic consequences is not required in all cases, the asserted impact 'cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.'" *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009)(quoting *Filius v. Potter*, 176 Fed. Appx. 8, 10 (11th Cir. 2006)).[15]  "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996)(quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)), *quoted in Davis*, 245 F.3d at 1242.

---

[15]"Unpublished opinions [of the Eleventh Circuit] are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

### a.  Reassignment from INH Nurse to Interim Second-Shift LPN

A disparate treatment claim grounded upon a change in work assignment "is one our circuit does not favor." *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013.)  "Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Id.* (quoting *Davis*, 245 F.3d at 1244).  To prove a change in work assignments is an adverse employment action, plaintiff must "show that her case is one of those unusual instances where the change in responsibilities was so substantial and material that it indeed altered the terms, conditions, or privileges of her employment." *Id.* (quoting *Davis*, 245 F.3d at 1245)(internal quotations omitted).

The evidence is undisputed that Wilson's responsibilities for the TB patients had significantly decreased by May 2011 and that Corizon had a need to fill a vacant second-shift LPN position on an interim basis.  The change in Wilson's responsibilities did not result in a substantial and material change in the terms, conditions, or privileges of her employment.  Her only complaints about any adversity related to the change in her job assignment are that it happened earlier than she had expected and only after she had complained about Hewitt.  While these complaints about the timing of the decision may be relevant for some other purpose, they are not relevant to a determination that the reassignment was an actionable adverse employment action.

The court finds plaintiff has not presented any evidence to show that her reassignment to the second shift LPN position was an adverse employment action. Therefore, her race and gender discrimination claims based on her reassignment to the temporary second shift position will be dismissed.

### b. Non-selection for Second Shift Permanent Position

Defendants contend, "[T]he fact that Wilson was not chosen for the LPN position [does not] constitute an adverse employment action. . . . Crucially, Yates ultimately hired Melissa Curry[, a white, female,] for the position, an undisputed fact that completely eviscerates Wilson's contention that she was denied this position because of her race or gender." (Doc. 22-1 at 26.) The race and gender of the selected candidate are not relevant to whether plaintiff's non-selection for the permanent position was an adverse employment action.

The second shift position was a full-time, permanent position – as opposed to the part-time, as needed position Wilson assumed. The court finds that Wilson's nonselection for a full-time permanent position was an adverse employment action.

### c. Hostile Work Environment

"Title VII [and Section 1981] prohibit[ ] the creation of a hostile work environment." *Vance v. Ball State University*, 133 S. Ct. 2434, 2441 (2013)(citations omitted); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). To qualify as an adverse employment action, "the plaintiff must show that the work environment was so pervaded by

discrimination that the terms and conditions of employment were altered." *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). "When the workplace is permeated with racially [or sexually] discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII [and Section 1981 are] violated." *Jones*, 683 F.3d at 1292 (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) and citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010))(internal quotations omitted); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.

> What qualifies as harassment? Title VII imposes no general civility code. It does not reach the ordinary tribulations of the workplace, for example, sporadic use of abusive language or generally boorish conduct. To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby altering the conditions of the victim's employment.

*Vance*, 133 S. Ct.. at 2455 (Ginsburg, J., dissenting)(internal citations and quotations omitted).

Therefore, "personal animosity is not the equivalent of the type of harassment prohibited by Title VII, and the plaintiff cannot turn a personal feud into such a Title VII claim." *Alhallaq v. Radha Soami Trading*, 484 Fed. Appx. 293, 296 (11th Cir. 2012)(quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986))(internal quotations and citation

omitted).  Also, evidence that her supervisor "scrutinized her work and pointed out her shortcomings on a regular basis . . . does not approximate the severity required to state a claim for hostile work environment."  *See Dudley v. Wal-Mart Stores, Inc.*, 931 F. Supp. 773, 816 (M.D. Ala. 1996), *abrogated on other grounds by  Moore v. State of Alabama*, 989 F. Supp. 1412 (M.D. AL 1997); *see also Green v. MOBIS Alabama, LLC*, Case No. 2:12-cv-277-MEF, 2014 WL 457683, *18 (M.D. Ala. Feb. 5, 2014)(employee's claim that employer watched her and scrutinized her work was "nothing more than ordinary workplace conflict").

Wilson has not presented evidence of any overtly racist or sexist intimidation, ridicule, and/or insult based on her race or her gender.  She complains that Hewitt did not like her and would not speak to her or help her.  In fact, she testified that she was the only employee Hewitt treated this way.  She complains that Yates yelled at her on May 4, 2011, and during her interview on June 11, 2011.  She testified that he tried to intimidate her and questioned her coworkers about her job performance.  These facts are insufficient to establish a hostile work environment due to race or gender harassment.  *See Adams v. Austal, U.S.A., L.L.C.*, ___ F.3d ___, No. 2014 WL 2726171, *11 (11th Cir. June 17, 2014).[16]

---

[16]The Eleventh Circuit found the following conduct insufficient to support a hostile work environment claim:

[Plaintiff] worked for [defendant] for eight months, during which he heard a white coworker say "nigger" and heard a supervisor say "nigger" in front of him, but the slurs were not directed at him and he did not work for the supervisor or remember his name.  He once saw a Confederate flag, and an employee showed him a photograph of nooses while smiling, but that employee "never engage[d] in th[at] type of behavior" after Cunningham

The conduct at issue in the case was neither severe nor pervasive and no reasonable employee would believe that the terms and conditions of their employment were materially and adversely altered because of racial or gender harassment.  Therefore, defendants' Motion for Summary Judgment will be granted and plaintiff's hostile environment claims will be dismissed.

### d.  Constructive Discharge

Defendants contend that plaintiff was not constructively discharged from her position with Corizon and that she chose to resign to take another position.  Plaintiff contends that she was told by Green that Yates was not going to give her any hours; however at no time were her hours actually eliminated or reduced.  As of July 1, 2011, the day she resigned, she was scheduled for 32 hours a week, the same number of hours she worked as the INH nurse.

In this Circuit –

> A constructive discharge qualifies as an adverse employment action. *See  Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000).  To establish a constructive discharge, a plaintiff must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign."  *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)(quotation marks omitted).  This objective standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment.  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231

---

reported it, and that employee later became "somewhat [his] best friend."  He also saw the graffiti in the men's restrooms, but he did not remember any specifics.

*Adams*, 2014 WL 2726171, at *11.

(11th Cir. 2001)(citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992)).

*Menzie v. Ann Taylor Retail Inc.*, 549 Fed. Appx. 891, 894-95 (11th Cir. 2013). "Thus, where a plaintiff cannot sustain a claim for hostile work environment sexual [or racial] harassment, her claim for constructive discharge will normally also fail." *Odom v. Fred's Stores of Tennessee, Inc.*, Civil Action No. 7:12–CV–91 (HL), 2013 WL 6498499, *10 (M.D. Ga. Dec. 11, 2013)(citing *Matthews v. City of Gulfport*, 72 F. Supp. 2d 1328, 1338 (M.D. Fla. 1999)).

For the reasons set forth above, the court finds that Wilson has not established a hostile work environment claim. Therefore, her constructive discharge claims, to the extent based on discriminatory harassment, are due to be dismissed.

A plaintiff may also establish a constructive discharge claim by showing that she was compelled or coerced to resign based on employment acts other than discriminatory harassment. "In order to show constructive discharge, . . . the plaintiff must show that the situation was so 'intolerable' that [she] had '***no choice***' but to [resign]." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005)(emphasis added). "The fact that one of the possible outcomes is that [she] would lose [her] job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge because the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'" *Id.* (citing, *inter alia*, *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990)).

31

Other employment actions can constitute constructive discharge under certain circumstances.  For example, the Eleventh Circuit has held "that employees may be constructively discharged by a demeaning demotion or transfer."[17]  *Riley v. Birmingham Bd. of Educ.*, 154 Fed. Appx. 114, 117 (11th Cir. 2005)(citing *Stamey v. So. Bell Tel. & Tel. Co.*, 859 F.2d 855, 860 n.11 (11th Cir.1988)).  However, the Eleventh Circuit has held, "To find constructive discharge we believe that the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a ***reasonable*** person in the employee's shoes would have felt compelled to resign. . . . Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."  *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)(quoting *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir. 1980)(citing *Alicia Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)))(emphasis in original).

A plaintiff cannot, as a matter of law, contend that she was discharged unless she can demonstrate that she had no objectively reasonable opportunity to remain employed.  Indeed, "the ***possibility*** that a plaintiff may not remain employed is not by itself enough to place a

---

[17]This analysis is separate from the inquiry into whether a demotion was an "actual termination."  *Thomas v. Dillard Dept. Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997.)  An "actual termination" claim "require[s] employees to show that their employers intended to and did terminate them in light of the specific circumstances of the challenged employment action."  *Id*.  For example, if the facts showed that Yates had actually stopped scheduling Wilson for any hours, she could claim this employment action was intended as a termination.  However, the evidence shows that Yates did not stop scheduling Wilson to work.  Therefore, the court finds that Wilson has not alleged an "actual termination."

reasonable person in the position of 'quit or be fired.'"  *Rowell v. BellSouth Corp.*, 433 F.3d

794, 806 (11th Cir. 2005)(emphasis added); *Hargray v. City of Hallandale*, 57 F.3d 1560,

1568 (11th Cir. 1995). "Resignations obtained in cases where an employee is faced with such

unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff ***had***

***a choice***.  Plaintiff could stand pat and fight."  *Hargray*, 57 F.3d at 1568 (quoting *Christie*

*v. United States*, 518 F.2d 584, 587, 207 Ct. Cl. 333 (1975))(internal quotations omitted;

emphasis in *Hargray*).

According to Wilson, she was forced to resign after Green told her that Yates was not

going to schedule her.  However, the record does not contain evidence that Yates took any

action to coerce plaintiff to resign or that he actually eliminated her hours.  Plaintiff may

have subjectively believed that Yates was going to eliminate her position, but no reasonable

person in her position would have felt ***compelled*** to resign in light of Green's statement.[18]

"The Eleventh Circuit has held that an employee's decision to resign in the face of possible

termination is not a constructive discharge."  *Walker v. Select Medical Rehabilitation*

*Services, Inc.*, No. 2:13-CV-2046-RDP, 2014 WL 411970, *3 (N.D. Ala. Feb. 3,

2014)(quoting *Graham v. Methodist Home for the Aging*, No. 2:11-CV-1416-SLB, 2012 WL

3637587, *20 (N.D. Ala. Aug. 20, 2012)(citing *Rowell*, 433 F.3d at 806; *Hargray*, 57 F.3d

---

[18]In an unpublished opinion, the Eleventh Circuit has held that telling an employee her hours would be reduced, but not actually reducing the employee's hours before she resigned, was not an adverse action.  *See Menzie v. Ann Taylor Retail Inc.*, 549 Fed. Appx. 891, 894 (11th Cir. 2013).

at 1568)).  Green's statement, as a matter of law, does not support a finding that Wilson had no opportunity to remain employed.  Therefore, she has not shown that she was compelled to resign.

The court finds plaintiff has not established that she was constructively discharged. Therefore, defendants' Motion for Summary Judgment will be granted and Wilson's race and gender discrimination claims based on her constructive discharge will be dismissed.

### 2.  Comparator Evidence

To establish a prima facie case of discrimination as to her remaining race and gender discrimination claims based on her nonselection for the second shift position, Wilson  must show that she was treated less favorably than a similarly-situated person outside her protected class.  In such cases, "The burden is on the plaintiff to show that she is a member of a protected class, that she applied for and was qualified for an available position, that she was rejected, and that the defendant filled the position with a person outside of the protected class." *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1274-75 (11th Cir. 2002)(citing *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989))).  The evidence in this case is undisputed that the selected applicant for the second shift position was Melissa Curry, a white female – the same race and gender as Wilson.

Plaintiff contends that Hewitt is her comparator, because Hewitt was treated more favorably.  (Doc. 26 at 31-33.)  "When evaluating an allegation of disparate treatment, [the

34

Eleventh Circuit] require[s] that a comparator be 'similarly situated to the plaintiff in all relevant respects.'" *Stone & Webster Const., Inc. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012)(quoting *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008)).  Hewitt was an RN, not an LPN like Wilson and Curry, and she did not apply for the second shift LPN position.  Also, nothing in the record indicates that Hewitt ever requested not to work in any area of Donaldson or with any other Corizon employees.  Therefore, as a matter of law, the court holds that Hewitt is not similarly-situated to Wilson and Wilson cannot show that Hewitt was treated more favorably with regard to the second shift position than Wilson.

Because Wilson cannot establish a prima facie case of discrimination with regard to her nonselection for the second shift position, the court finds defendants' Motion for Summary Judgment is due to be granted.  Wilson's race and gender discrimination claims based on her nonselection for the second-shift position will be dismissed.

## B.  RETALIATION

### 1.  Direct Evidence

Plaintiff contends:

> "Under this circuit's precedent, direct evidence of discrimination is competent evidence which, if believed, would prove the existence of a fact at issue without inference or presumption." *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997).

> Defendant admits that Yates "was the decision-maker who determined whether Wilson would be placed in the full time LPN position."  Def. Br. at 16.  Yates admitted that he failed to hire Wilson for the full-time second shift

LPN position because he "identified as problematic the fact that Wilson had requested that she not work with Hewitt and Nicholas [aka Rambo], yet the position required the successful applicant to work all shifts and in all areas of the facility, including the first shift and in the infirmary, where Hewitt and Nicolas worked." DX 5 at 153:16-155:15, Ex. 18 at 432. "Accordingly, Yates informed Wilson that she was not selected for the open position, because that position required flexibility in assignments and she had expressed an unwillingness to work all assignments." *Id*. There is no other way to interpret this statement except that Yates did not select Wilson because she complained about Hewitt. Since Wilson clearly complained that Hewitt was creating a hostile work environment and made racist statements to her, DX 3, Ex. 3, Yates'[s] testimony is an admission that he failed to consider Wilson for the full-time second shift LPN position because of her complaints of discrimination leveled against Hewitt.

(Doc. 26 at 24-25.)

"Direct evidence of discrimination is 'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact without inference or presumption.'" *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). (alterations and quotation marks omitted). Indirect evidence is circumstantial evidence. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir.1999). "Therefore, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence." *Akouri v. State of Florida Dept. of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005)(internal quotations and citations omitted).

36

Therefore, to establish her retaliatory nonselection claim by direct evidence, Wilson's evidence must show that Yates did not select her for the second shift position because she had engaged in protected activity – not simply that he did not select her because of her complaint about Hewitt. As discussed more fully below, to establish protected activity for purposes of establishing a retaliation claim under § 1981 and/or Title VII, plaintiff must show that she had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir.1997). Therefore, to find that Yates did not select plaintiff for the second shift position because she had complained about Hewitt, the fact-finder is required to find that plaintiff's complaint about Hewitt and/or her statement that she could not or would not work with Hewitt constituted activity protected by § 1981 and/or Title VII. Yates statement – that he would not select plaintiff because she could not work everywhere or with everyone – does not prove that plaintiff's inability to work everywhere or with everyone was protected.

The court finds that plaintiff has not produced direct evidence that she was not selected for the second-shift position was unlawful retaliation.

### 2. Circumstantial Evidence

In order to establish a prima facie case of retaliation in violation of Title VII and Section 1981, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir.

2008).  Because the court finds that Wilson has not established that she engaged in protected activity, the court pretermits further discussion of the elements of her prima facie case or whether defendants' articulated reasons for the alleged adverse actions were pretextual.

Wilson contends that she "engaged in protected activity when she verbally complained to Yates about race discrimination and again when she submitted a written complaint of race discrimination to Yates."  (Doc. 26 at 27.)  Defendants contend that, "Any allegation that Wilson subjectively believed she experienced actionable racial harassment is not objectively reasonable in light of existing substantive law.  As in *Butler,* '[i]t is not even close.'"  (Doc. 22-1 at 36 [citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008)].)

Wilson testified that she complained, verbally to Yates about Hewitt's "because you're black" comment to Hackworth.  She mentioned "hostile environment" in her written statement, dated May 2, 2011, due to the medication error of April 29, 2011.  Her written complaints do not mention race or gender discrimination.  Rather, she complains Hewitt was trying to stir the pot and create conflict between Wilson and the other nurses about the medication error.  She wrote that she found Hewitt's statement to Hackworth to be "a racist remark," "disrespectful," and "hurtful."  (*Id*. at 172-73.)  However, Hewitt's comment, which was not about or to Wilson and did not concern anything to do with the medication error,  was not "racist."  It was not insulting or intimidating; it did not include any racial slur or epitaph.  A reasonable person would not have believed that Hewitt's comment was racist simply because she mentioned Hackworth's race.  No reasonable person would believe that

Hewitt's conduct after Wilson's medication error created a hostile environment based on race or gender harassment.

According to Eleventh Circuit precedent –

> To establish statutorily protected conduct under Title VII's opposition clause, [Wilson] must show that [she] had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.  [She] must show both that [she] subjectively believed that [Corizon and/or Yates] engaged in unlawful discrimination and that [her] belief was objectively reasonable in light of the facts and record present.  [Wilson] need not prove that the conduct he opposed was actually unlawful, but the reasonableness of [her] belief that [Corizon and/or Yates] engaged in an unlawful employment practice must be measured against existing substantive law.

*Howard*, 605 F.3d at 1244.  Wilson's complaints do not meet the reasonableness standard.

The court finds that Wilson has not established that she engaged in protected activity; therefore, the court finds she has not established a prima facie case of retaliation. Defendants' Motion for Summary Judgment will be granted and plaintiff's retaliation claims will be dismissed.

39

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order granting defendants' Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 23rd day of March, 2015.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE